UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| ANITA RENN, | : | Case No. 1:09-cv-319 |
| | : | |
| Plaintiff, | : | Judge Sandra S. Beckwith |
| | : | Magistrate Judge Timothy S. Black |
| vs. | : | |
| | : | |
| COMMISSIONER OF | : | |
| SOCIAL SECURITY, | : | |
| | : | |
| Defendant. | : | |

**REPORT AND RECOMMENDATION[1] THAT: (1) THE ALJ'S NON-DISABILITY FINDING BE FOUND SUPPORTED BY SUBSTANTIAL EVIDENCE, AND AFFIRMED; AND (2) THIS CASE BE CLOSED**

This is a Social Security disability benefits appeal. At issue is whether the administrative law judge ("ALJ") erred in finding Plaintiff "not disabled" and therefore unentitled to a period of disability and disability insurance benefits ("DIB"). (*See* Administrative Transcript ("Tr.") (Tr. 12-25) (ALJ's decision)).

**I.**

On December 30, 2006, Plaintiff filed an application for a period of disability and DIB, alleging that she became disabled on July 3, 2002, due to back problems, obesity, depression, and low IQ. (Tr. 12).

---

[1] Attached hereto is a NOTICE to the parties regarding objections to this Report and Recommendation.

Upon denial of Plaintiff's claims on the state agency levels, she requested a

hearing *de novo* before an ALJ. A hearing was held on September 10, 2008, at which

Plaintiff and her father, Elvin Renn, appeared with counsel and testified. (Tr. 12). A

vocational expert, Janice L. Bending, was also present and testified. (*Id.*)

Following the hearing, the ALJ issued a final administration decision denying DIB.

(Tr. 25). The Appeals Council denied Plaintiff's request for review. (Tr. 5). Plaintiff

then filed the action that is presently before this Court.

At the time of the hearing, Plaintiff was 42 years old. (Tr. 498). She graduated

from high school with mostly A's and B's in special education classes. (Tr. 188-89). Her

past relevant work experience was as a laundry worker, food packager, assembler, hand

bander (machine operator), and salad preparer (after her alleged injury). (Tr. 115-16,

502).

The ALJ's "Findings," which represent the rationale of his decision, were as

follows:

1.   The claimant meets the insured status requirements of the Social
     Security Act through December 31, 2008.

2.   The claimant has not engaged in substantial gainful activity since July 3,
     2002, the alleged onset date (20 CFR 404.1520(b) and 404.1571 *et seq.*).

3.   The claimant has the following severe combination of impairments:
     lumbosacral spine degenerative disc disease, status post discrectomy;
     obesity; depressive disorder; borderline intellectual functioning (20 CFR
     404.1520(c)). The claimant is status post L4 avulsion fracture, which is
     considered to be a non-severe impairment.

-2-

4.   The claimant does not have an impairment or combination of impairments
     that meets or medically equals one of the listed impairments in 20 CFR Part
     404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.   After careful consideration of the entire record, the undersigned finds that
     the claimant has the residual functional capacity to perform the
     requirements of work activity except as follows: She can lift, carry, push
     and pull up to 20 pounds occasionally and 10 pounds frequently. In an
     eight-hour workday, she is able to stand and/or walk 6 hours. She can only
     occasionally stoop, kneel, crouch, climb ramps/stairs and perform work
     requiring the forceful use of her lower extremities. She should not crawl,
     climb ladders, ropes or scaffolds, work at unprotected heights or work
     around hazardous machinery. Mentally, she is able to perform only simple,
     routine, repetitive tasks. She is able to understand, remember and carry out
     only short and simple instructions. She can make only simple work-related
     decisions. She cannot interact with the general public, coworkers or
     supervisors more than occasionally. Her job should not require more than
     ordinary and routine changes in work setting or duties, nor should it require
     more than simple reading, simple writing and simple math.

6.   The claimant is capable of performing past relevant work as a hand bander
     (poster service) and hand packer as actually performed and as customarily
     performed in the national economy. This work does not require the
     performance of work-related activities precluded by the claimant's residual
     functional capacity (20 CFR 404.1565).

7.   The claimant has not been under a disability, as defined in the Social
     Security Act, from July 3, 2002 through the date of this decision (20 CFR
     404.1520(f)).

(Tr. 14-24).

In summary, the ALJ concluded that Plaintiff was not under a disability as defined

by the Social Security Regulations and was therefore not entitled to a period of disability

or DIB. (Tr. 25).

-3-

On appeal, Plaintiff argues that: (1) the ALJ erred when he failed to find that the impairments in combination meet or equal listing numbers 12.05(C) and/or 12.05(D); (2) the ALJ erred in determining Plaintiff's residual functional capacity; and (3) the ALJ erred in failing to evaluate Plaintiff's subjective complaints, pain and credibility. Each argument will be addressed in turn.

## II.

The Court's inquiry on appeal is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). In performing this review, the Court considers the record as a whole. *Hephner v. Mathews,* 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if substantial evidence also exists in the record upon which the ALJ could have found plaintiff disabled. As the Sixth Circuit has explained:

> "The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard presupposes that there is a "zone of choice" within which the Commissioner may proceed without interference from the courts. If the Commissioner's decision is supported by substantial evidence, a reviewing court must affirm."

*Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

The claimant bears the ultimate burden to prove by sufficient evidence that she is entitled to disability benefits. 20 C.F.R. § 404.1512(a). That is, she must present sufficient evidence to show that, during the relevant time period, she suffered an impairment, or combination of impairments, expected to last at least twelve months, that left her unable to perform any job in the national economy. 42 U.S.C. § 423(d)(1)(A).

**A.**

For her first assignment of error, Plaintiff maintains that the ALJ erred when he failed to find that the impairments in combination meet or equal listing numbers 12.05(C) and/or 12.05(D).[2]

---

[2]     Listing 12.05 provides as follows:

12.05 *Mental Retardation*: mental retardation refers to significantly subaverage general intellectual functioning with adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function OR

D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence or pace; or
4. Repeated episodes of decompensation, each of extended duration

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05. To meet the requirements of a listed impairment, a plaintiff must satisfy all of the elements of that impairment.

The relevant medical record reflects that:

### *Physical Functioning*

Plaintiff allegedly became disabled on July 3, 2002 as a result of back pain. (Tr. 59). Plaintiff went back to work for one day in August 2002, but complained of pain and did not return to work the next day. (Tr. 208). Plaintiff then began to see Dr. Mitchell Simons, who referred Plaintiff to have two spinal epidural injections. (Tr. 332). Despite the injections, on September 4, 2003, Plaintiff complained of pain of 4.5 out of 10 in her lower back, which altered her gait. (Tr. 329). However, Dr. Simons noted that Plaintiff had an "excellent range of motion" with no muscle banding. (*Id.*) One week later, on September 18, 2003, Dr. Simons completed a "Medical Report" form sent to him by Plaintiff's attorney. (Tr. 328). In that report, Dr. Simons wrote the Plaintiff could sit for four hours per day, stand and walk for two hours per day, and lift 10 pounds occasionally and five pounds frequently. (*Id.*)

One week after Dr. Simons' report, Dr. Arthur L. Sagone, a state agency reviewing physician, opined that Plaintiff was only partially credible. (Tr. 412). Dr. Sagone believed that Plaintiff could sit or stand for six hours out of an eight hour day and lift 50 pounds occasionally and 25 pounds frequently. (Tr. 408).

Although Plaintiff had no pain after some chiropractic treatments in October 2003 (Tr. 238), by May 2004, Plaintiff was complaining of a pain level of four out of ten (Tr. 323). Plaintiff continued to see Dr. Simons, who noted on March 11, 2005, that Plaintiff

walked with a cane and a pain-altered gait. (Tr. 311). On March 29, 2005, Dr. Simons reported that Plaintiff had run out of medication. (Tr. 310). One week later, Plaintiff complained of a pain level of nine out of ten, but had run out of medication again. (Tr. 309).

On May 19, 2005, Plaintiff had successful back surgery for three herniated discs. (Tr. 246, 447). By January 23, 2006, Dr. Simons noted that 90% of Plaintiff's pain was gone. (Tr. 303).

Five months later, however, Dr. Simons wrote that Plaintiff had poor range of motion and evidence of an inflamed back nerve. (Tr. 302). However, one week later, Dr. Jennifer Wischer Baily, a state agency examining physician, opined that Plaintiff's back was normal with no evidence of muscle weakness or atrophy. (Tr. 279). She also observed that Plaintiff had a normal gait, normal reflexes, and normal range of lumbar motion. (Tr. 278-279). Dr. Baily concluded that Plaintiff "appear[ed] capable of performing a moderate amount of sitting, ambulating, standing, bending, kneeling, pushing, pulling, lifting and carrying heavy objects." (Tr. 279). Dr. Baily also commented that "[o]besity contributes to her symptoms and weight reduction would diminish her complaints." (*Id.*) Two days later, X-rays showed that Plaintiff's back was normal except for a fracture in one disk. (Tr. 281).

Two weeks later, Dr. Walter Holbrook, a state agency reviewing physician, assessed Plaintiff as being able to lift 25 pounds frequently and 50 pounds occasionally

and sit, stand, and walk approximately six hours in an eight-hour workday. (Tr. 399).
While Dr. Holbrook did note that Plaintiff had bulging and dried-out discs, he also
commented that Plaintiff had normal spine alignment, "essentially normal" range of
motion, no evidence of atrophy, intact sensation, and the ability to ambulate
independently and effectively. (*Id.*) Dr. Holbrook also wrote that Plaintiff was only
partially credible, as her statements as to the severity and duration of her symptoms were
not supported by objective evidence. (Tr. 403). Five months later, an occupational
therapist opined that Plaintiff could only stand for one-third of the day. (Tr. 265).

Plaintiff had two more spinal epidural injections on June 9, 2006 and July 13,
2006. (Tr. 290, 295). But on July 27, 2006, Plaintiff complained of pain of 9 out of 10.
(Tr. 428). One month later, an MRI showed dryness and bulging in four discs. (Tr. 456-
57). Plaintiff continued to complain of 9 out of 10 or greater pain, although on
September 21, 2006, her range of motion was either normal or 80% of normal. (Tr. 436).
Two months later, Plaintiff said that she was not taking any of her prescribed pain
medication. (Tr. 435). Plaintiff claimed that her pain prevented her from: (a)
functioning; (b) following her vocational rehabilitation program; and (c) engaging in a
job search. (*Id.*) However, Dr. Simons thought that Plaintiff's mother "seem[ed] very
fixated on [Plaintiff] continuing to receive her disability checks." (*Id.*) Dr. Simons
"educated [Plaintiff] that we want to try to get [Plaintiff] more functional and productive
so possibly she could work . . . but the mother is wanting her just to have permanent and

total disability so [Plaintiff] can continue to receive money and not really have to be functional for it." (*Id.*)

Dr. Simons continued to counsel Plaintiff about taking her medications, commenting on April 3, 2007, that "we really need to go ahead and have her become more compliant with the treatment." (Tr. 429). Five months later, Plaintiff reported that she had more pain because she had an "extra busy [and] active" weekend. (Tr. 466). On November 27, 2007, a nurse noted that Plaintiff was minimally active and had difficulty walking for any prolonged period of time, but still did not "appear to really be taking her medication as we advised her to." (Tr. 424). Plaintiff was prescribed three Darvacet (pain medication) pills a day, but admitted to only taking one or occasionally two pills a day. Also, Plaintiff said that she took Neurotin (another pain medication) only at night, because it made her sleepy. (*Id.*)

On January 25, 2008, Dr. Simons wrote a letter to support Plaintiff's workman's compensation claim where he noted that Plaintiff required a cane. (Tr. 454). As Plaintiff continued to complain of pain of 9 out of 10 or more, Dr. Simons opined that Plaintiff probably would not be able to return to work without a spinal cord simulator. (Tr. 421). However, on March 25, 2008, Dr. Simons agreed with Plaintiff's counsel that it would be difficult for Plaintiff to get total disability under workman's compensation. (Tr. 420).

Two months later, Dr. Simons wrote that Plaintiff claimed that she could not walk, but when he "asked her to get on her toes" she "d[id] fine." (Tr. 418). Dr. Simons also documented "slightly positive Waddell findings" (tests to determine whether lower back

pain is exaggerated) and concluded that he did "not see any weakness really going on here." (*Id.*) While Plaintiff did "have degenerative changes," she was only taking low levels of pain medication. (*Id.*)

Four months later, at the hearing, Plaintiff testified that she did not take medications as directed by her physician, because they made her sleepy. (Tr. 507). Plaintiff also said that she could not lift more than five pounds, sit for more than five minutes, or walk more than 20 steps. (Tr. 505).

### *Intellectual Functioning*

Dr. John Heidman, a consultative examining psychologist, performed the first assessment of Plaintiff's intellectual abilities. Dr. Heidman diagnosed Plaintiff with borderline intellectual functioning, but opined that no psychological impairment prevented Plaintiff from getting a job. (Tr. 236). He administered an I.Q. test to Plaintiff, which showed a verbal I.Q. of 65, performance I.Q. of 75 (with four out of eight scores for memory tests in the low average range), and a full scale I.Q. of 66. (Tr. 233-234). However, Plaintiff's reading comprehension was at a 7.1 grade level (Tr. 234) which was "better than would be expected of an individual with an FSIQ [full scale I.Q.] of 66." (Tr. 236). Dr. Heidman further noted that Plaintiff kept a cat, managed her own bathing and dressing, maintained appropriate grooming and hygiene, and visited NASCAR and music sites on the internet. (Tr. 232). Dr. Heidman also observed that Plaintiff had no trouble paying attention during the I.Q. test, but did not concentrate well enough to solve multiplication problems in her head. (Tr. 236). Also, while Plaintiff worked at a

-10-

marginally slow pace, she was appropriately persistent. (*Id.*) Dr. Heidman thought that Plaintiff could understand, remember, and follow simple and some detailed instructions, but probably could not manage her own finances. (*Id.*)

Dr. Alice L. Chambly and Dr. Todd Finnerty, reviewing state agency psychologists, and Dr. Chris H. Modrall, an examining state agency psychologist, also believed that Plaintiff had borderline intellectual functioning. (Tr. 377, 384, 441). Dr. Chambly thought that Plaintiff had moderate limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. (Tr. 390). Dr. Finnerty rated Plaintiff's skill levels higher that Dr. Chambly, opining that Plaintiff had only mild limitations in activities of daily living and maintaining social functioning, and moderate limitations in maintaining concentration, persistence, or pace. (Tr. 371). Dr. Finnerty also believed that Plaintiff could interact appropriately with coworkers, care for own needs, and maintain adequate concentration, attention, and persistence. (Tr. 377). However, he did note that Plaintiff could only follow one or two step tasks that were routine. (*Id.*)

Plaintiff's treating psychologist, Dr. David P. Schwartz, also estimated that Plaintiff's I.Q. was in the borderline range. (Tr. 444). While Plaintiff had mild to moderate impairments in her short-term memory, attention, and concentration abilities, she was oriented to time and place, and her insight and judgment were intact. (*Id.*)

Dr. George W. Lester examined Plaintiff at the request of her attorney. (Tr. 467). Dr. Lester gave a far different view of Plaintiff's intellectual abilities than the other five

psychologists who evaluated Plaintiff. Dr. Lester relied upon Plaintiff's parents to establish Plaintiff's adaptive skills. (Tr. 470). Based upon their claims, Dr. Lester opined that Plaintiff's overall adaptive behavior composite standard score was 63. (*Id.*) Dr. Lester explained that he did not agree with the other psychologists' views that Plaintiff had adaptive skills above the mentally retarded range, because while Plaintiff "might be able to read at a sixth grade level . . . [she] would not be able to comprehend at a sixth grade level."[3] (*Id.*) Dr. Lester wrote that Plaintiff had moderate difficulties in maintaining social function, marked restrictions of activities of daily living, and frequent deficiencies of concentration, persistence, or pace, resulting in failure to complete tasks in a timely manner. (Tr. 475). Therefore, Dr. Lester concluded that Plaintiff's impairments would cause her to miss work more than three times a month. (Tr. 476).

To meet Listings 12.05(C) or 12.05(D) for mental retardation, a claimant has the burden of showing: (1) "significantly subaverage general functioning," (2) "deficits in adaptive functioning initially manifested . . . before age 22," (3) "IQ of 60 through 70," and (4) an "impairment imposing an additional and significant work-related limitation or function" or other restrictions and difficulties listed in Paragraph (D) of Listing 12.05. 20 C.F.R. Pt. 404, Appt. 1, § 12.05 (2008). An ALJ can determine that a claimant does not have significant deficits in adaptive functioning, even if the claimant has an I.Q. score of 70 or below. *Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 126 (6th Cir. 2003); *West v. Comm'r of Soc. Sec.,* 240 F.Appx. 692, 694-699 (6th Cir. 2007). Also, an

---

[3]     No tests showed that Plaintiff read at a sixth grade level.

ALJ can discount a psychological/educational assessment if the ALJ believes that the assessment relied upon a source who might have given inaccurate information. *Williamson v. Sec'y of Health & Human Servs.*, 796 F.2d 146, 149 (6th Cir. 1986). Furthermore, when there are two competing views among physicians as to plaintiff's condition, it is the role of the ALJ to determine which opinion to give greater weight. *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981).

In finding that Plaintiff did not meet Listing 12.05, the ALJ relied on the conclusions of Drs. Heidman (Tr. 236), Chambly (Tr. 384), Finnerty (Tr. 377), Schwartz (Tr. 444), and Modrall (Tr. 441), that Plaintiff had borderline intellectual functioning. Plaintiff, however, contends that "[t]he diagnosis of borderline I.Q. does not hurt [Plaintiff's ability to qualify under Listing 12.05], as such a diagnosis included an I.Q. of 70 under the DSM-IV." (Doc. 4 at 3). This statement is incorrect, as the DSM-IV states that "borderline intellectual functioning . . . is, an I.Q. in the 71-84 range." Diagnostic and Statistical Manual of Mental Disorders 740 (Am. Psychiatric Ass'n 4th ed., test revision 2000).

Plaintiff's daily activities show that she had high adaptive functioning, as she cared for a cat, managed her own bathing and dressing, maintained appropriate grooming and hygiene, and used a computer to surf the internet and burn CD's. (Tr. 232-33). Furthermore, Plaintiff tested in the low average range (even higher than borderline functioning) for four out of eight tests for memory (Tr. 234) and was able to understand, remember, and follow simple and some detailed instructions (Tr. 236). Even more

-13-

significant, Plaintiff tested at the 7.1 grade level for reading comprehension (Tr. 234), which, as Dr. Heidman indicated, would not be expected of an individual with mental retardation (Tr. 236). Because the Plaintiff had borderline adaptive functioning, substantial evidence supports the ALJ's determination that Plaintiff did not meet Listing 12.05. *See Elam*, 348 F.3d at 126 (claimant did not meet the listing for mental retardation because two psychologists stated that the claimant "was actually operating within the borderline range of intellectual functioning, although her intelligence test scores, standing alone, would indicate mental retardation."); *see also West*, 240 F.Appx. at 694, 688-99 (claimant with an I.Q. of 66 did not meet Listing 12.05, because two psychologists stated that claimant's adaptive functioning was not at the mental retardation level).

Plaintiff claims that "[r]eading at the 7.1 grade level is also not fatal under 12.05" because the Sixth Circuit noted in *Brown v. Sec'y of Health & Human Servs.*, 948 F.2d 268, 270 (6th Cir. 1991), that "completing the 6th grade in school was not inconsistent with an I.Q. score there of 68!" (Doc. 4 at 3). Plaintiff, however, completed high school, not just the sixth grade. (Tr. 188-89). Furthermore, in *Brown*, there was no psychologist who opined that the claimant had borderline intellectual functioning. *Brown*, 948 F.2d at 270. Here, in contrast, five psychologists opined that Plaintiff had borderline intellectual functioning, not mental retardation. (Tr. 236, 377, 384, 441, 444).

The only doctor who opined that Plaintiff had borderline intellectual functioning was Dr. Lester who assessed Plaintiff at the request of her attorney. (Tr. 467). Dr. Lester determined Plaintiff's adaptive functioning based upon the reports of Plaintiff's parents.

-14-

(Tr. 470). But Dr. Simons noted that Plaintiff's mother was focused on getting Plaintiff declared totally disabled instead of treating her condition. (Tr. 435). Because Dr. Lester (a) based his findings (in part) on likely biased reporting, and (b) contradicted the views of five other psychologists, the ALJ was correct in discounting his opinion. *See Kirk*, 667 F.2d at 536 (stating that when there are contradictory medical opinions it is the role of the ALJ to determine which opinion is given more weight); *see also Williamson*, 796 F.2d at 149 .

As Plaintiff could not meet the initial requirement of Listing 12.05 (low adaptive functioning), the ALJ did not need to determine whether Plaintiff met sections (C) or (D) of the listing. *See* 20 C.F.R. Pt. 404, App. 1, § 12.05 (2008).

## B.

For her second assignment of error, Plaintiff claims that the ALJ erred in determining Plaintiff's residual functional capacity.

### *RFC and Mental Abilities*

Plaintiff worked as a hand bander (machine operator) for five years. (Tr. 115). There is not evidence that her mental abilities were ever an issue at that job. Yet, even though Plaintiff has made no assertion that her mental abilities worsened over time, she still claims that the ALJ failed to properly consider whether her mental abilities would prevent her from going back to her job. In particular, Plaintiff argues that the ALJ erred when he did not specifically mention "mild to moderate impairments on short-term memory, attention, and concentration" (Doc. 4 at 4) when listing Plaintiff's limitations in

-15-

the RFC portion of the Decision (Tr. 17-28) and when stating Plaintiff's RFC to the vocational expert at the hearing (Tr. 530).

However, the ALJ referenced those factors when explaining the reasoning behind his RFC in the Decision. (Tr. 23). Therefore, the ALJ considered these observations when he formulated the portion of the RFC (after her alleged injury) dealing with memory, attention, and concentration, namely that "[m]entally, [Plaintiff] is able to perform only simple, routine, repetitive tasks. She is able to understand, remember and carry out only short and simple instructions." (Tr. 18). The ALJ also used practically identical language when he posed a hypothetical question to the vocational expert at the hearing regarding Plaintiff's issues with memory, attention, and concentration. (Tr. 53).

### *RFC and Physical Abilities*

Plaintiff claims that the ALJ "erred . . . when he did not explain how he arrived at his physical and mental residual functional capacities in view of: (1) an occupational therapist's functional capacity evaluation from November 15, 2005 that estimated that Plaintiff could only stand for one-third of the day; and (2) a September 18, 2003 form sent to Dr. Simons by Plaintiff's counsel, where Dr. Simons opined that Plaintiff could only sit for four hours, stand and walk for two hours, and lift five to ten pounds. (Doc. 4 at 5). Plaintiff further contends that the September 18, 2003 form was written when Plaintiff described her pain as four out of ten. (*Id.* at 5). As Plaintiff rated her pain at nine out of ten at various points in 2006-2008, Plaintiff contends that her abilities at that time were even more limited than those in Dr. Simons' September 18, 2003 form. (*Id.*)

-16-

With regard to the November 2005 occupational therapist's evaluation, the ALJ explicitly mentioned (and discounted) its limitations in his explanation of his RFC. (Tr. 20). Also, the ALJ was not required to give the evaluation controlling weight, because, among other reasons, it was authored by a non-acceptable medical source, not a physician or psychologist. *See* SSR 06-3p; 20 C.F.R. § 404.1513(c).

Although the September 2003 form was actually authored by a physician, Dr. Simons, it was written before Plaintiff's successful May 2005 back surgery and before Dr. Simons noted that Plaintiff was not complying with her treatment. Specifically, Dr. Simons indicated that after successful back surgery, Plaintiff's activity level had improved dramatically and that 90% of her pain was gone. (Tr. 20, citing 303). Furthermore, on September 21, 2006, Plaintiff complained to Dr. Simons of nine out of ten pain, even though Dr. Simons noted that her range of motion was either normal or 80% of normal. (Tr. 436).

On November 16, 2006, Plaintiff complained that her pain was preventing her from functioning, following her vocational rehabilitation program, and engaging in a job search. (Tr. 435). Yet, she was not taking her pain medication. (*Id.*) When Dr. Simons wanted to discuss the issue, Plaintiff's mother "seem[ed] very fixated on [Plaintiff] continuing to receive her disability checks." (*Id.*) Dr. Simons tried to "educate[] [Plaintiff] that we want to try to get [Plaintitff] more functional and productive so possibly she could work . . . but the mother is wanting her just to have permanent and total disability so [Plaintiff] can continue to receive money and not really have to be

functional for it." (*Id.*) Dr. Simons and his nurse noted on five other occasions that Plaintiff was taking either too little or no pain medication, despite complaining of nine out of ten pain on four of those occasions. (Tr. 309, 310, 418, 424, and 429).

On May 20, 2007, besides noting that Plaintiff was taking too "low [a] level" of her pain medication, Dr. Simons wrote that he saw some evidence that Plaintiff was exaggerating her symptoms. (Tr. 418). That same day, although Plaintiff said that she could not walk, she "d[id] fine" when Dr. Simons "asked her to get on her toes." (*Id.*) In addition, two months earlier, Dr. Simons wrote that he doubted that Plaintiff would qualify for total disability. (Tr. 420). Accordingly, Dr. Simons had ample reason to believe that Plaintiff's functional capacity had improved since he filled out the September 2003 form.

The ALJ did not simply cite post-September 2003 comments of Dr. Simons to support his finding that the Plaintiff was not disabled. Rather, the ALJ also relied upon the assessments of three other physicians. Both Dr. Sagone and Dr. Holbrook, state agency reviewing physicians, opined that Plaintiff could sit or stand for six hours out of an eight hour day and lift 50 pounds occasionally and 25 pounds frequently. (Tr. 21, citing Tr. 399, 408). Similarly, Dr. Baily examined Plaintiff and assessed her as being "capable of performing a moderate amount of sitting . . . standing . . . [and] lifting." (Tr. 20, citing Tr. 279). The opinions of Drs. Sagone, Holbrook, and Baily as to Plaintiff's high levels of physical functioning, taken together with Dr. Simons' observations that Plaintiff was exaggerating her symptoms and would be more functional if she complied

with her treatment, provided the ALJ with substantial evidence upon which to base his RFC. Furthermore, that substantial evidence justifies the ALJ's discounting of the September 2003 form and the occupational therapists' evaluation. *See Kirk*, 667 F.2d at 536 (when there are two competing views among physicians as to Plaintiff's condition, it is the role of the ALJ to determine how much weight to give each opinion).

The ALJ correctly noted that Plaintiff "walked with a cane mostly due to her personal preference, as no physician, at least until a recent [January 25, 2008] appeal for WC to pay for additional treatment, had prescribed an ambulatory device as medically necessary." (Tr. 24). Plaintiff argues that a cane was medically necessary because Dr. Simons "approved the use of a cane" by "never sa[ying] not to use the cane." (Doc. 4 at 5). But as using a cane (even though it might not be medically necessary) would not harm Plaintiff, Dr. Simons had no need to tell Plaintiff to stop using a cane.

Additionally, even though Dr. Simons wrote in a January 25, 2008 letter to workman's compensation that Plaintiff needed a cane, Dr. Simons did not hold that opinion a few months later. Despite Plaintiff's claim that she could not walk, on May 20, 2008, Dr. Simons noted that she was able to walk on her toes without a problem. (Tr. 418).

Upon careful review, the undersigned finds that substantial evidence exists to support the ALJ's RFC.

## C.

For her final assignment of error, Plaintiff claims that the ALJ erred in failing to evaluate Plaintiff's subjective complaints, pain, and credibility.

The ALJ's assessment of credibility is entitled to great weight and deference, since she had the opportunity to observe the witness's demeanor. *Duncan v. Sec'y of Health & Human Servs.,* 801 F.2d 847, 852 (6th Cir. 1986) (any credibility determinations concerning subjective complaints of pain are the exclusive domain of the hearings officer).

> The assessment of a claimant's assertions of disabling pain is made in light of factors set forth in 20 C.F.R. § 404.1529, summarized in a two-part test:
> First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine:
> (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

*Infantado v. Astrue,* 263 Fed. Appx. 469, 475 (6th Cir. 2008) (quoting *Felisky,* 35 F.3d at 1038-39).

In the instant case, the objective medical evidence does not confirm Plaintiff's subjective complaints. "Whenever a claimant's complaints regarding symptoms, or their intensity and persistence, are not supported by objective medical evidence, the ALJ must make a determination of the credibility of the claimant in connection with his or her complaints 'based on a consideration of the entire case record.'" *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 247 (6th Cir. 2007) (quoting SSR 96-7p, 1996 SSR LEXIS 4, at

*4 (July 2, 1996)).

The ALJ noted that three separate functional capacity evaluations did not bear out Plaintiff's claims regarding her alleged heavily limited function. (Tr. 20-21, citing Tr. 279, 399, 408). Plaintiff claimed that she was unable to walk more than 20 steps without difficulty (Tr. 505), yet spoke of an "extra busy [and] active" weekend (Tr. 424). Furthermore, as mentioned above, when Plaintiff complained that she was unable to walk, Dr. Simons noted that she had no problems walking on her toes. (Tr. 418). Additionally, Dr. Simons noted on five occasions that Plaintiff was taking too little pain medication, despite complaining of 9 out of 10 pain level. (Tr. 309, 418, 424, 429, 435). It is a well-established rule that failure to follow pain medication undermines a claimant's credibility. *Hardaway v. Sec'y of Health & Human Servs.*, 823 F.2d 922, 927 (6th Cir. 1987).

Plaintiff attacks the Decision on four specific points. First, Plaintiff claims that the ALJ failed to mention "the strong pain medications." (Doc. 4 at 7). However, not only did the ALJ note that Plaintiff was prescribed pain medications (Tr. 21), he considered the effect of her "less than compliant approach towards pain management" (Tr. 22). Second, Plaintiff states that the ALJ "erred when he did not give the 2005 low back surgery proper weight." (Doc. 4 at 7). However, the ALJ did consider the surgery in developing his findings, stressing that the surgery was successful. (Tr. 19, 22).

Third, Plaintiff criticizes the ALJ for referencing that Plaintiff had "an extra busy and active weekend" because "[w]hat does . . . [that] mean with regard to doing light work for 40 hours a week[?]" (Doc. 4 at 6). However, it is unclear how this question

actually challenges the ALJ's point that having an extra busy and active weekend indicates that Plaintiff may have been "more active than she claimed" (*e.g.*, be able to walk more than 20 steps). (Tr. 24).

Finally, Plaintiff emphasizes the ALJ mentioning that "Dr. Simons noted that the claimant's Waddell findings were slightly positive, indicating some symptom magnification." (Tr. 21, 23, citing Tr. 418). Plaintiff claims that the ALJ made an "error of law" by referencing the Waddell findings, because "the test requires positive finding on 3 of the tests to be significant." (Doc. 4 at 6). First, Dr. Simons does not mention how many tests had a positive finding. (Tr. 418). Second, the Waddell findings were just one of many factors that the ALJ used in determining that Plaintiff was not credible. (Tr. 20-24).

Accordingly, the undersigned finds that the ALJ's credibility findings are supported by substantial evidence.

### III.

For the foregoing reasons, Plaintiff's assignments of error are unavailing. The ALJ's decision is supported by substantial evidence and should be affirmed.

### IT IS THEREFORE RECOMMENDED THAT:

The decision of the Commissioner, that Plaintiff was not entitled to a period of disability and disability income benefits, be found **SUPPORTED BY SUBSTANTIAL EVIDENCE**, and **AFFIRMED**; and, as no further matters remain pending for the Court's review, this case be **CLOSED.**

**IT IS SO RECOMMENDED.**

Date: __2/26/10__

s/ *Timothy S. Black*
Timothy S. Black
United States Magistrate Judge

| ANITA RENN, | : | Case No. 1:09-cv-319 |
| | : | |
| Plaintiff, | : | Judge Sandra S. Beckwith |
| | : | Magistrate Judge Timothy S. Black |
| vs. | : | |
| | : | |
| COMMISSIONER OF | : | |
| SOCIAL SECURITY, | : | |
| | : | |
| Defendant. | : | |

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written

objections to the proposed findings and recommendations within **FOURTEEN DAYS**

after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P.

6(e), this period is automatically extended to **FOURTEEN DAYS** (excluding intervening

Saturdays, Sundays, and legal holidays) when this Report is being served by mail and may

be extended further by the Court on timely motion for an extension. Such objections shall

specify the portions of the Report objected to and shall be accompanied by a

memorandum of law in support of the objections. A party may respond to another party's

objections within **FOURTEEN DAYS** after being served with a copy thereof. Failure to

make objections in accordance with this procedure may forfeit rights on appeal. *See*

*United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140, 106

(1985).